THE ALICIA A. WASHBURN, etc.

THE B. K. WASHBURN, etc.

(*District Court, S. D. New York.* February 21, 1884.)

1. COLLISION—STEAM-TUG WITH TOW—ROUNDING BEND.
    A steam-tug with a tow, in going around a dangerous bend, where the tide sets strongly across the river, is not entitled, as a matter of right, to occupy the full half of the river on the right-hand side.
2. SAME—DUTY OF SCHOONER BECALMED.
    A schooner rounding such a bend in the opposite direction, becalmed or nearly so, is bound to make use of the customary means of oars, or a small boat ahead, to keep some steerage way in order to avoid collision with other vessels.
3. SAME—CASE STATED.
    Where the steam-tug W., with a tow on a hawser, was proceeding northward around West Point in the Hudson river, and met several sailing vessels becalmed, floating down with the tide, a short distance apart, and the W., having overtaken another tow a little below West Point, passed it on the left instead of the right, as she might have done, thereby going round the bend nearly in the middle of the river, when there was abundant room to go to the eastward; and the schooner H., nearly becalmed, drifted down around the bend with the tide, which there set strongly to the eastward across the river, carrying the H. against the W.'s tow, and the schooner used no oars or small boat, as she might have done, to give her some headway and aid in avoiding the tow: *held*, that both were in fault,—the tug for proceeding unnecessarily towards the middle of the river, knowing the strong set of the tide, and the danger to sailing vessels becalmed; and the schooner, for not using customary means to aid in avoiding the collision.

Collision.

*Benedict, Taft & Benedict*, for libelant.

*P. Cantine,* for respondent.

BROWN, J. On the night of March 31, 1880, the libelant's schooner Maria E. Hearn, of about 130 tons burden, with a cargo of 27,000 bricks, came into collision with an ice-barge in tow of the A. A. Washburn, on the Hudson river, off the West Point light, and shortly after

capsized and sank. The night was cloudy and dark, but not thick; the wind light, from the north-east; the tide about half ebb, and strong. The Washburn, a powerful steam-tug, was coming up the river, making against the tide about six miles per hour by land, having two ice barges in tow upon a hawser about 450 feet long. When a little way below the West Point light she overtook the steam-tug McDonald, with a large and heavy tow upon a hawser about 500 feet long, making by land about three miles per hour. The Washburn, with her tow, passed on the west side of the McDonald, between Boat-house Point and West Point. The ice-barge on the Washburn's starboard side, in passing, rubbed along against the fenders on the port side of the McDonald, being set against her, doubtless, by the ebb tide, which, in passing around and below West Point, sweeps strongly to the eastward. While the Washburn and her tow were thus passing the McDonald and her tow, three schooners and a sloop were observed coming down the bend, between Magazine Point and West Point, in the following order: the Dubois, the Hearn, the Voorhees, and the sloop, estimated to be respectively from 400 to 500 feet apart, and nearly in line. About the same time the Albany night boat, the St. John, or the Drew, came down past Magazine Point, and sounded two whistles, to which the Washburn at once replied with two. All the sailing vessels had their sails set. The witnesses from them testify that they had not wind enough, between Magazine Point and West Point, to give them steerage way; that they drifted down with the tide, and got wind again after passing West Point. The Dubois passed on the west side of the Washburn and her tow, using an oar at the bows to keep the schooner's head to the westward, but passing so near that they apprehended collision. The witnesses from the Dubois testified that when she passed the tow of the Washburn that tow was about 75 feet distant to the eastward, and that the McDonald was then abreast of the Washburn's tow. The pilot of the McDonald testifies that when this tow was abreast of him he was about due east from the light, and that the collision between the Hearn and the tow was when the latter had gone about 200 feet ahead of him. This fixes very approximately the place of collision, except as respects the distance from the shore, and shows that the Washburn, which was some 450 feet ahead of the place of collision, must have been headed well round towards the westward in the bend. The witnesses from the Hearn testify that they came past Magazine Point nearly in the middle of the river; that they drifted with the set of the tide to within 200 feet of the West Point shore; and that, as they approached the Washburn and her tow, they put their boom to port, and struck the tow of the Washburn when not over 200 feet from the west shore. The main sheet of the Hearn got caught in the samson's-post of the barge, which held her fast for a short time; but, being soon released, the schooner drifted downward and to the eastward, upon and across the port hawser of the McDonald's tow, and

there filled, capsized, and sank. The Voorhees also passed on the west side of the Washburn, being headed in towards the westward, by means of an oar. Her witnesses testify that she narrowly escaped collision with the Washburn's tow, though going within about 30 feet of the rocks on the western shore. The sloop passed to the east of the Washburn and of the McDonald; and the St. John, or Drew, having checked her speed, passed on the east side of all the other boats, the sloop going between the steamer and the McDonald at an estimated distance of about 100 feet from each.

The case has been elaborately considered by counsel on both sides. For the claimants it is urged that no liability exists on their part; because, as they claim, the evidence shows that they were not on the westerly half of the river; and that the collision could have been avoided had the Hearn used an oar, or a small boat rowing ahead, as they allege is customary with sailing vessels becalmed. Very little reliance is to be placed upon the extremely different estimates of the distances of the various boats from shore. Untrustworthy as such estimates at night always are, they are especially so in this case, when the night was so dark, and the testimony is given several years after the occurrence. All that can be done in such cases is to endeavor to arrive at the most probable solution of the case from other circumstances less liable to great mistake.

Without discussing further the numerous points of difference in the testimony, the following facts seem to me sustained by the evidence and the probabilities of the case: (1) That the McDonald was going up not far from the middle of the river. (2) That there was room for the Washburn to pass her on the east side had she wished to do so. This I consider to be clearly established by the subsequent passage of the sloop and of the St. John to the eastward. (3) That the Washburn's tow rubbed against the McDonald in passing on the west side of the latter; and that her port boat was consequently not over 100 feet to the west of the McDonald. (4) That the collision between the Hearn and the Washburn's tow was some 200 feet ahead and somewhat to the westward of the McDonald, as is shown by the fact that the Hearn, after the collision, drifted with the easterly set of the tide down and across the McDonald's port hawser. (5) That there was not sufficient wind between Magazine Point and West Point to give steerage way to the sailing vessels; and that in such circumstances it was customary for sailing vessels to make use of an oar at the bows, or of a row-boat in front, in order to keep steerage-way and to guide their course.

The easterly set of the ebb-tide in coming around West Point; the liability to meet sailing vessels coming from above, as well as their liability to be becalmed between Magazine and West Points; and the risk of meeting tows coming up,—are familiar facts, presumably known to all the parties. The especial danger arising from these circumstances in going around West Point bend, where vessels could not be

seen to each other more than a mile distant, imposed upon both parties alike the obligation of acting with a prudence and caution commensurate with the known danger. The captain of the McDonald testified that between Boat-house Point and West Point "was no place for one tow to pass another," on account of the dangers incident to the place. This case, I think, proves that he is right. I have no doubt that the cause of the collision was the Hearn's drifting with the tide against the tow of the Washburn in going around the bend. A steamer, in going around such a bend, where a sailing vessel is likely to be becalmed, and where the tide has so strong a set across the river, is bound to keep well out of the way, when there is nothing to prevent her doing so, and thus give plenty of room for becalmed and drifting vessels to pass, without danger of collision. There is no rule which allows to a steamer, in such a situation, the full half of the river; nor is it any sufficient defense that she was not on the westerly side, where, from the peculiar set of the tide, the westerly half of the river is not sufficient for sailing vessels, becalmed and drifting, to pass around such a bend with safety. I am satisfied, therefore, that the Washburn should be held in fault because she did not go nearer to the easterly shore of the river, where there was abundant room for her to go. The McDonald herself was further to the westward than was necessary; and tows overtaking each other in that vicinity, unless they are sailing to the extreme right of the river, should forbear attempting to pass each other until they have gone beyond the points of danger.

The Hearn, however, cannot be held blameless. There was no reason why she should not have used oars at her bows, so as to give her some headway, or change her heading, as the other schooners did; or else have made use of a row-boat, as was proved to be frequently done by other vessels for the same purposes; no reason, I say, except, possibly, the fact that she was tardy in discovering the approach of the tug and tow, and her own danger. The evidence is very strong to the effect that her captain did not see the Washburn at all until within 150 feet of her. He states this twice explicitly; although the lookout says that he gave him notice of it at a much greater distance. If the captain is right, his knowledge of the Washburn's approach was, doubtless, too late to enable him to accomplish much by oars or a row-boat. But that would only convict him of another fault, viz., that of not keeping a proper lookout; and upon his own testimony I strongly suspect that that was the fact. Considering the known danger from tugs that might be coming up around that bend while he was nearly becalmed, there is no excuse for his not keeping a sharp lookout, or not being fully prepared for the instant use of oars or a boat, if any danger should be descried; and either of these might have been used effectively if the Washburn was seen at the distance stated by the lookout. From the fact that all the vessels made use of a change in the position of their sails, evidently for the purpose of

making some change in their courses, and particularly from the testimony of the captain of the sloop in this regard, I think there is some doubt whether the sailing vessels in the reach between Magazine and West Points were in fact totally becalmed, and whether they did not have at least some little headway, though it was doubtless slight. The evidence, I think, indicates that the captain of the Hearn was tardy in the change of his boom. In the various particulars above stated it seems to me that he did not act with the watchfulness, alertness, and prudence which the situation reasonably demanded of him, and which, if observed, might have enabled him to avoid the collision; and that the Hearn must, therefore, be held in fault.

As I must find the collision to have arisen, therefore, through fault on the part of both vessels, the damages must be divided, and an order of reference may be taken to compute the amount.